| | |
|---|---|
| **J.G.A. GUILLERMO ALBORNOZ BENITEZ,** *Ecuador,* | Civ. No. 17-917 (KM) |
| **Petitioner,** | **OPINION** |
| v. | |
| **KRISTHEL ANGELICA DIAZ HERNANDEZ,** | |
| **Respondent.** | |

**KEVIN MCNULTY, U.S.D.J.:**

J.G.A. Guillermo Albornoz Benitez ("Mr. Albornoz," sometimes referred to in the evidence as "Guillermo") brings this proceeding against his wife, Kristhel Angelica Diaz Hernandez ("Ms. Diaz," sometimes referred to in the evidence as "Kristhel"), under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* Their daughter, "T.A.A.," was born in 2006, and is now 11 years old; their son, "J.G.A.," was born in 2008 and is now 9 years old. Mr. Albornoz alleges that on June 18, 2015, Ms. Diaz removed the children from Ecuador without his consent, and is wrongfully retaining them in the United States. Mr. Albornoz requests that the children be returned to Ecuador.

This court has jurisdiction pursuant to 42 U.S.C. § 11603(b) and 28 U.S.C. § 1331. Venue is proper because Ms. Diaz and the children currently reside in New Jersey.

As in prior removal cases, I find it helpful to begin by stating explicitly some of the things this case is not. It is not a divorce proceeding; it is not a child custody determination; it is not a judgment of which is the more fit

parent; it is not a debate over the relative merits of two countries as an environment for rearing children. The Hague Convention and ICRA have a far narrower focus: to restore the status quo where there has been a wrongful removal, and permit any rulings on divorce and custody to be made in the proper jurisdiction.

Having reviewed the parties' submissions and conducted an evidentiary hearing, I hold that the removal was not wrongful, and for the reasons set forth below, the Petition is **DENIED**.

## I.  LEGAL FRAMEWORK OF THE HAGUE CONVENTION

The two main purposes of the Hague Convention are "to ensure the prompt return of children to the State of their habitual residence when they have been wrongfully removed" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, Preamble, Art. 1. The Hague Convention's procedures are not designed to settle international custody disputes. *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006). Rather, the Hague Convention is designed to restore the *status quo ante* any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases. *Baxter v. Baxter*, 423 F.3d 363, 367 (3d Cir. 2005).

The Hague Convention reflects a universal concern about the harm done to children by parental kidnapping and a strong desire among the Contracting States to implement an effective deterrent to such behavior. Hague Convention, Preamble. Both the United States and Ecuador are signatory nations. The United States Congress established procedures to implement the Hague Convention through ICARA, 42 U.S.C. § 11601 *et seq.*, expressly recognizing its "international character" and the "need for uniform international interpretation" of its provisions. 42 U.S.C. § 11601(b)(2), (3)(B).

Any person seeking the return of a child in the United States may commence a civil action under the Hague Convention by filing a petition in a

court of the jurisdiction in which the child is located. 42 U.S.C. § 11603(b). To obtain an order for the child's return under the Hague Convention, the petitioner bears the burden of proving by a preponderance of the evidence that the removal or retention was wrongful under Article 3. 42 U.S.C. § 11603(e)(1)(A).

Under Article 3 of the Hague Convention, the removal or retention of a child is "wrongful" where:

a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. *See also Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995).

The Hague Convention does not define "habitual residence." The perspective is child-centered, but that perspective takes on a different meaning in accordance with the age and maturity of the child. The U.S. Court of Appeals for the Third Circuit considers whether the child has become acclimatized, *i.e.,* whether the relocation has a settled purpose from the child's perspective, and whether there is shared parental intent to change residence. *Id.* at 224. Critical to the analysis is the "child's experience in and contacts with his surroundings, focusing on whether he 'develop[ed] a certain routine and acquire[d] a sense of environmental normalcy' by 'form[ing] meaningful connections with the people and places [he] encountered' in a country prior to the retention date." *Karkkainen*, 445 F.3d at 292 (quoting *Evans-Feder*, 63 F.3d at 550-51). The Third Circuit considers parental intent as it colors the child's perspective, but also gives parental intent "independent weight." *Id.* For a very young child, the parents' intentions are dispositive. As the child grows older, however, the child's own connections to the particular country take on much greater

significance. *See Whiting v. Krassner*, 391 F.3d 540, 551 (3d Cir. 2004) (parents' shared intent given dispositive weight as to habitual residence of 18-month-old child); *Feder v. Evans-Feder*, 63 F.3d at 222 (giving greater weight to evidence of acclimatization of 4-year-old boy); *Karkkainen*, 445 F.3d at 293-97 (giving great weight to intent of independent 11-year-old, where parents had agreed to let her choose her activities and country of residence).

In summary, to state a *prima facie* case in a proceeding under the Hague Convention for the return of a child wrongfully removed to or retained in another State, the petitioner must establish by a preponderance of the evidence that: (1) the child was habitually resident in one State and was removed to a different State; (2) the removal was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of removal. *Karkkainen*, 445 F.3d at 287; *Baxter*, 423 F.3d at 368. For the reasons stated herein, this case focuses on the second element: whether Diaz's removal of the children to the U.S. was wrongful in that it breached Albornoz's custody rights, or whether it was done in furtherance of the couple's mutual agreement to carry on living in the United States.

## II.    PROCEDURAL HISTORY[1]

On March 30, 2016, the Ecuadoran Ministerio de Inclusión Económica y Social ("MIES") forwarded to the U.S. Department of State, Office of Children's

---

[1]    Because the matter is time-sensitive, I did not await the preparation of transcripts, but worked from my notes of the testimony.

Record items repeatedly cited will be abbreviated as follows:

VP  =    Verified Petition of Mr. Albornoz (ECF no. 1),
             with attached exhibits (ECF nos. 1-1 through 1-9).

KDD =    Declaration of Kristhel Diaz (ECF no. 5)

MSD =    Declaration of Maria R. Suarez (ECF no. 5-1)

CSD =    Declaration of Catalina Sinning (ECF no. 5-2)

YPD =    Declaration of  Yamile Pardo (ECF no. 5-3)

JAD =    Declaration of Joselinne Arias (ECF no. 5-4)

4

Issues, a Request for Return of Children filed by Mr. Albornoz. (ECF no. 1-1) That Request for Return, dated March 22, 2016, alleged that on June 18, 2015, Ms. Diaz had taken the children from Ecuador to the United States without Mr. Albornoz's consent.

That Request for Return became the foundation of the Verified Petition filed in this case on February 10, 2017. The Verified Petition alleges that the children were taken without consent, in violation of Ecuadorian law. It calls upon this court to order their return to Ecuador under the Hague Convention and the ICRA.

That same day, I entered an order directing a written response to the Verified Petition on or before March 2, 2017. (ECF no. 3) On March 1, 2017, Ms. Diaz did file her Answer. (ECF no. 4) I also scheduled a telephone conference for March 6, 2017.

At the conference, I set the matter down for an evidentiary hearing on April 7, 2017. I directed the parties to submit declarations in lieu of direct testimony, and to make the declarants available for cross-examination at the hearing. I permitted the parties to supplement the declarations, however, with direct or redirect testimony.

Mr. Albornoz relied on his Verified Petition, with attached exhibits, in lieu of a separate declaration. Ms. Diaz submitted declarations of herself; Maria R. Suarez (also referred to in the record as "Rocío"); Catalina Sinning; Yamile Pardo; and Joselinne Arias. (*See* note 1, *supra*.) At the hearing, all of the declarants, including Mr. Albornoz and Ms. Diaz, testified.[2] Each witness swore to the truth of the contents of his or her declaration, and I permitted cross-

---

[2]    At an initial conference with counsel, I stated that if any party intended to call either child as a witness, I would arrange to make the experience as easy as possible for the child. The children did not, however, testify or provide written statements. I commend both sides for placing the welfare of the children above any perceived litigation advantage.

examination and redirect examination. Numerous exhibits were received in evidence as well.

At the end of the hearing, I reserved decision. I gave counsel until close of business on Monday, April 10, 2017, to state whether they wished to submit post-hearing briefs. Counsel have not responded. Briefing is thus complete, and the record is closed.

## III.  DISCUSSION

Many Hague Convention cases focus on the issue of habitual residence, and thus involve extensive evidence, factual and psychological, regarding the acclimatization of the children to living in one country or the other. This is not such a case. The children did not testify, and the parties presented only limited evidence regarding their acclimatization to Ecuador.

The issue here, as presented by the parties, focuses on the second element of a Hague Convention claim: whether Ms. Diaz's removal of the children from Ecuador to the U.S. violated Mr. Albornoz's custody rights. As both parties see it, it was the parties' agreement, or not, to return to the U.S. to live that rendered Diaz's removal of the children either permissible or wrongful.[3]

---

[3]     Albornoz alleges that the Ecuadorian Constitution prohibits removal of children from the country without both parents' authorization. (VP ¶ 9) The Verified Petition states that a copy of the relevant "Act" is attached as Exhibit E, but it is not attached. I have been unable to verify through online research that the cited Articles of the 2008 Ecuadorian Constitution in fact say this.

If the issue were a critical one dividing the parties, I might find that Albornoz had failed to furnish a sufficient basis for a determination of foreign law. *See generally* Fed. R. Civ. P. 44.1; *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 440–41 (3d Cir. 1999). But the legal issue is not critical. Diaz does not deny that Albornoz, as the father in an intact marriage, had custody rights. She does not claim that she had the right to unilaterally remove the children over his objection. Her argument, rather, is that she did have his consent and agreement that the family would return to the U.S. to live, and that the removal of the children was therefore authorized and lawful.

## A.    The Factual Disputes

This case therefore depends substantially on the resolution of one key issue:

> (a) Did Ms. Diaz wrongfully remove the children from Ecuador in June 2015 and retain them in the U.S. without Mr. Albornoz's consent?

Or, alternatively,

> (b) Did the couple agree that the family was to return to the U.S. permanently?

Underlying that key issue are several subsidiary factual disputes.

One set of disputed facts concerns the family's departure for Ecuador in July 2014. According to Diaz, Albornoz promised her that they were not relocating, but would return to the U.S. after he set up a business there. According to Albornoz, the move was intended to be permanent.

A second set of disputed facts surrounds the return of Diaz and the children to the U.S. in June 2015. According to Diaz, Albornoz agreed that the family would permanently return to the United States, and he planned to rejoin them in New Jersey later, after selling off business equipment. According to Albornoz, Diaz and the children traveled to the U.S. only for a summer vacation, and were supposed to rejoin him in Ecuador.

I resolve the key factual disputes largely in Ms. Diaz's favor. Based on the totality of the evidence, I conclude that Diaz did not act wrongfully in returning to and remaining in New Jersey with the children. I find that she did so pursuant to the couple's agreement to resume their life here after a time in Ecuador. Mr. Albornoz abandoned that agreement only later, in connection with the dissolution of the marriage. That he did so is understandable, but his change of heart did not retroactively render Diaz's conduct wrongful.

### 1. **Credibility factors**

In the course of the hearing, I had the opportunity to observe the demeanor of the witnesses and assess their credibility. In doing so, I considered such usual factors as the witnesses' apparent ability to recall; their general affect and demeanor; the apparent influence of bias or interest in shaping the narrative; the inherent plausibility of the accounts; and the extent to which their testimony fit with other evidence. I have carefully reviewed all exhibits, but have cited only those that appeared particularly important; many merely confirmed testimony that was not substantially in dispute. To the extent that any facts were not directly pertinent to the issues but necessary to an understanding of the parties' actions and motives, I have recited them here for that limited purpose.

Generally speaking, I made allowances on both sides for the expedited nature of the proceedings and the limited time to prepare. The Verified Petition, for example, did not focus on certain factual issues, particularly those surrounding whether the parties agreed to live permanently in Ecuador or to return permanently to the United States. I did not penalize Albornoz for failing to anticipate all such issues. Rather, I permitted both Albornoz and Diaz, when testifying live, to supplement the facts contained in their written submissions. The other witnesses did so to a lesser extent, and for the same reasons I permitted it. Counsel used the absence of certain facts from the declarations to impeach certain witnesses; this was permissible cross examination, and I considered it, but under the circumstances, I did not give it great weight.

One witness, Yamile Pardo, a close friend since 2011, ran a clothing boutique. She met Diaz through Albornoz, who filmed a short video for her store. She described Diaz as "sad"; said Diaz was manipulated by her husband; and expressed disapproval that Diaz was not allowed to work, had no money of her own, and exercised no decision making authority. (YPD ¶¶ 2–3) Pardo said she had no dislike for Albornoz personally, but did not like his treatment of

Diaz. She acknowledged that she opposed the move to Ecuador. She was aware that Albornoz considered her a "bad influence" on Diaz and discouraged the friendship; she and Diaz, when talking on the telephone, would use a code word to signal that Albornoz was nearby. On the witness stand, Pardo impressed me as intelligent, sincere, and observant. Her recollection was detailed. It was clear of course that she was very much on Diaz's side and conscious of Albornoz's negative attitude toward herself. Noting those possible sources of bias, I treated Pardo's testimony with some caution, giving it weight chiefly where it was corroborated by other evidence or testimony.

Catalina Sinning knew both Diaz and Albornoz. Their daughters went to the same dance class, which was next door to Albornoz's business. Sinning's daughter attended Albornoz's modeling school, A Models. Her recollection was detailed and credible. Though clearly sympathetic to Diaz, she did not evince any hostility to Albornoz, and I credited her testimony.

Joselinne Arias, a student/employee of A Models beginning in 2011, when she was a teenager, testified primarily to Albornoz's statement of his intent to return to the U.S. and reconstitute the modeling business. Ms. Arias showed no obvious signs of bias; although friendly with Diaz, she also owed her early employment and training to Albornoz. She did not seem to be invested in either side of the dispute, and she impressed me as sincere and credible. I accepted her testimony as truthful.

Potent third-party testimony was given by Maria R. Suarez, known to the parties as "Rocío." She met Albornoz when she employed him to take photographs for her restaurant, El Rincón Colombiano, in approximately 2009. Albornoz described her as a dear friend, and acknowledged that he confided in her about problems in the marriage. It was at Albornoz's request that Suarez put up Diaz and the children in her apartment from approximately June to December 2015. Before Diaz returned to the U.S. in 2015, Suarez did not know her or the children very well, but they became close; Albornoz described the Suarez/Diaz relationship as being like that of mother and daughter. During

their stay, Suarez developed the opinion that Albornoz was at fault for giving Diaz insufficient attention, and treating her as a service employee for himself and his sisters. Suarez seemingly came to resent being saddled with the support of Diaz and the children. She felt that Albornoz, by staying in Ecuador, was shirking his responsibilities. Suarez's assessment of the situation, however, was balanced and tempered by an appreciation of Albornoz's genuine pain and desire to save the marriage. Her testimony was credible and coherent, and it was lent additional weight by her status as a trusted confidante of both parties. As to the facts, I generally accepted Suarez's testimony as true. As to Suarez's judgments and opinions, however, I exercised some caution; I perceived that she, like Pardo, had ultimately come down on Diaz's side of the controversy.

Specific findings about the credibility of Albornoz and Diaz themselves are woven into the discussion below. Generally, of course, they both have a vital interest in the outcome.

I considered facts about the state of the parties' marriage for the limited purpose of assessing the parties' plausible motives and incentives in agreeing, or not, to live in the U.S. In my estimation, any assessment of what was agreed to by Albornoz and Diaz must take into account the dynamics of their relationship. The age difference between them, Ms. Diaz's own testimony, and the testimony of her witnesses, all suggest that Albornoz was the dominant party in the marriage. Pardo, for example, supported Diaz's testimony that Albornoz did not let Diaz have her own money or make her own decisions; Albornoz replied that he gave Diaz what she needed and that their decisions were all cooperative. He appeared reluctant to assign independent agency to Diaz, attributing her decisions and attitudes to the "bad influence" of her friends. As the years went on, and during periods of separation from her husband, Diaz began to experience more independence, both psychological and financial. (*E.g.,* KDD ¶ 25) Diaz grew increasingly restive and dissatisfied in the

marriage. She testified amply to her feeling that her husband was unduly controlling and critical of her.

I believe that both parties for the most part tried to convey the truth as they saw it. When weighing the testimony, I had to consider that Albornoz might at times have mistaken his own wishes for the parties' mutual agreement. Conversely, Diaz's growing dissatisfaction with the marriage might well have tinged her recollection of what the parties had agreed to before.

## 2.    Background Facts

Mr. Albornoz was born in Ecuador in 1969; he is now 47 years old. He comes from a very large family. He has a few family members in the U.S., but a much larger number of family members in Ecuador. Mr. Albornoz moved to the U.S. in 2003, and has been a U.S. citizen since 2009.

Ms. Diaz was born in Venezuela in 1987; she is now 30 years old. She moved to the U.S. in 2004, and obtained permanent resident status in April 2014.

Albornoz and Diaz first met in Venezuela in 2002, when he was 33 and she was 15. She joined him in the United States two years later, in 2004, and they lived together for two years in Manhattan. In 2006, they moved to North Bergen, New Jersey. On October 1, 2011, Albornoz and Diaz were married in New York.

Their first child, a daughter, T.A.A., was born in New Jersey in 2006. Their second, a son, J.G.A., was born in New Jersey in 2008. Both are U.S. citizens. They resided in the U.S. from their birth until the family went to Ecuador in July 2014; in Ecuador from July 2014 to June 2015; and again in the U.S. from July 2015 to the present.

A photographer and printer by trade, Mr. Albornoz ran his own businesses in the U.S. These included a modeling school called "A Models" in North Bergen, New Jersey. Before returning to the U.S. in 2015, Diaz did not work outside the home except in Albornoz's business, which did not pay her.

### 3. Agreement when leaving the U.S. in 2014

In 2013, Albornoz's father advised him that there were no businesses like his in Ecuador. Albornoz decided to take advantage of the opportunity. He shipped both business equipment and the family's personal property to Ecuador. For reasons that were not explained, he then spent several months in Venezuela, while Diaz and the children remained behind, living with Albornoz's sister in New York. At some point the sister asked them to move out.

It was only then, on July 12, 2014, that Diaz and the children flew to Ecuador. (ECF no. 1-7) Albornoz purchased their tickets, which were round-trip. In Ecuador, the family lodged with Albornoz's brother for about a month. They then moved to the commercial building where Albornoz had started his business. Diaz did not have the necessary papers to work in Ecuador.

The children were enrolled at the Johannes Kepler School.[4] Although the children are more fluent in English than in Spanish, the school records from Ecuador suggest that they completed their requirements. (*See* ECF no. 4-1 at 7–15)

The parties' testimony clashed as to their intentions when leaving the U.S. in 2014. Diaz testified that she was deeply unhappy about going to Ecuador, but that the move was forced upon her by Albornoz, who controlled the purse strings, shipped the couple's property, bought the airline tickets, and so on. She testified that Albornoz knew of her feelings, and promised her that the move was temporary; once the business was set up, he said, they would return to the United States. (*E.g.,* KDD ¶¶ 11, 12) Albornoz testified to the contrary: the couple's agreement in 2014, he said, was to make Ecuador their home, and he denied making any agreement to the contrary.

---

[4]     School records refer to the first and third grades. (ECF no. 1-9) The enrollment date is listed as October 14, 2014, when J.G.A. was 6 and T.A.A. was 8. The dates on the Ecuadorian records, by the way, are European style: day/month/year.

The surrounding objective facts are equivocal. Albornoz shipped both their personal property and their business equipment to Ecuador. That fact, and the children's yearlong attendance at an Ecuadorian school, surely indicate that this was more than a casual trip. No one denies that Albornoz intended to set up a business in Ecuador. That necessarily would take some time, and it would not be unusual to bring a large amount of personal property for a year's stay. Albornoz further notes that although he has some family connections in the U.S., he has many more in Ecuador. Nevertheless, Albornoz had lived in the U.S. for a long time and had taken the trouble to become a citizen. Diaz had recently become a U.S. permanent resident, and both parties testified that it was important for her to maintain that status. Both of the children are U.S. citizens. The external facts, then, are not really inconsistent with either party's version. I turn to the testimony of the other witnesses.

Joselinne Arias, a student/employee of A Models beginning in 2011, testified as to Albornoz's contemporaneous expression of intent. In 2013, she testified, Albornoz called a meeting of A Models employees and announced that he would be shutting down the business. He stated that he planned to set up a similar business in Ecuador. Once the Ecuadorian business was established, he said, he would return to the United States, reopen the modeling academy, and "re-unite all the girls from the business" at a new location in Manhattan. (JAD ¶ 3) For the reasons stated above, I credit Arias's testimony in this regard.

It would be naïve to think that people make permanent, unchangeable plans; that their feeling are unmixed; or that spouses can always share a single intent without harboring any mental reservations or resentments. I do find factually, however, that the parties left for Ecuador in 2014 with the intent to return.

### 3. Agreement re: return to the U.S. in June 2015

The parties' agreement when leaving the U.S. in 2014, however, is perhaps less important than their intentions in connection with Diaz's June

2015 departure from Ecuador with the children. The evidence is in conflict, but on balance it favors Diaz's interpretation: that she left in the context of the couple's agreement to live in the U.S. and try to make the marriage work here.

What is not in dispute is that there had been trouble in the marriage for some years, and that the trouble continued during the sojourn in Ecuador. The couple, regular church goers, sought counsel from their pastor and church members, and attended a family workshop.

As Diaz describes it, they attempted to reach an agreement to save the marriage. Part of that accommodation was that Albornoz agreed to stop speaking disrespectfully of Diaz to others, and Diaz agreed to be more tender and loving to him. Most pertinently, she says, Albornoz acknowledged that Diaz was unhappy in Ecuador, and for the sake of the marriage agreed that the family would resume their life in the U.S. They agreed that Diaz would return with the children, and that Albornoz, after selling off the business equipment, would follow. (KDD ¶¶ 16, 20)

Diaz's account is internally plausible, and it fits the external facts. Both in his testimony about his feelings at the time, and through his demeanor on the stand, Albornoz conveyed sincere and deep anguish about the dissolution of the marriage. It is not difficult to believe—indeed it is to his credit—that he would have made concessions at a time when he believed the marriage might be saved.

The circumstances of the departure of Diaz and the children from Ecuador in June 2015 bear clear indicia of consent. Diaz and the children used the second half of their U.S./Ecuador round-trip air tickets, and Albornoz paid the airline fee for them to do so.[5] Albornoz accompanied Diaz to the children's

---

[5]     Diaz relies to some extent on the round trip tickets as proof of intent. I take judicial notice, however, that a round trip (or onward) ticket is not necessarily proof of a firm plan to return by a particular date. It may be purchased as convenient proof of intent not to overstay one's visa. (Indeed some countries appear to require such proof, although I could not readily confirm that Ecuador required it in 2014.) A round-trip ticket may also be purchased as insurance against the inconvenience and expense of

school and attended an informal ceremony marking J.G.A.'s departure a few days before the actual end of term.

Albornoz (apparently accompanied by family members) drove Diaz and the children to the airport. T.A.A. was then 9, and J.G.A. 7 years old. Albornoz telephoned Catalina Sinning, a friend, and arranged for her to pick up Diaz and the children from the airport in New York. (CSD ¶5) He also telephoned his old friend Maria Suarez, and arranged for her to house Diaz and the children in her apartment. (MSD ¶ 2)

In short, there is no doubt that Albornoz knew about, consented to, and indeed facilitated the June 2015 departure of Diaz and the children.

Albornoz points to other facts and urges contrary inferences. He cooperated with these arrangements, he says, because he thought Diaz was coming back. The timing of the trip, in his version, was dictated by the necessity that Diaz return to the U.S. to maintain her permanent resident status, and Diaz admitted as much. Although this does not explain why she brought the children, Albornoz does say that they were to attend summer day camp in the U.S., which in fact they did.

With respect to the circumstances surrounding the June 2015 departure, Albornoz's credibility suffered in some respects. The Verified Petition, sworn to by Albornoz both on paper and on the witness stand, states that Diaz took the children to the U.S. "without Guillermo's consent or authorization," and that Diaz "went so far as withdrawing the children from school before the end of the school year." (VP ¶ 10) This account has a misleading slant. In the context of the Petition's other, accurate allegations, however, I initially considered that the language barrier might have been to blame.[6]

---

being refused entry, or because it is cheaper than purchasing a one-way return from the destination country.

[6]    On the witness stand, Albornoz stated in substance that he did not understand all of the allegations of the Verified Petition. Nevertheless, I cannot ignore it altogether.

Also concerning, however, is the Questionnaire in support of the Request for Return of Children (ECF no. 1-6). Albornoz attached that Questionnaire to the Verified Petition as an exhibit, without any indication that the answers were inaccurate. In answer to Question 15, about how he learned the children had been removed to the United States, Albornoz stated:

> Since neither the Mom nor the children came back home after school hours, I started search them at school, with close friends and even in hospitals. After a few hours, I received a phone call from [Diaz], letting me know they have arrived New York and were on the way to New Jersey.

(ECF no. 1-6 at 2, Question no. 15) On cross-examination, Albornoz explained this away as an error in translation, and stated that it referred to some other, earlier incident in Ecuador. To be fair, the translation was done by a U.N. employee Albornoz knew at church, not by a certified interpreter, and it does contain errors of syntax. If an error, however, it was a dramatic one; it is hard to see how this account of a frantic search for the children could have inadvertently crept into an account of, *e.g.,* driving Diaz and the children to the airport.[7]

The mistranslation explanation is further undercut by Albornoz's answer to Question no. 17: "[T]here was no incident, no disagreement or any situation that could give me an idea that [Diaz] was going to leave Ecuador with my

---

Albornoz swore to it and intended for me to rely on it as the basis for *ex parte*, emergent injunctive relief—including seizure of Diaz and the children by a U.S. Marshal. (*See* VP ¶¶ 14–16) I denied the application for emergent relief, however.

Paragraph 20 of the Verified Petition incorrectly lists Albornoz's sole address for the last 5 years as one in Ecuador. Once again, possibly a mistake, but one that conveniently minimizes his U.S. contacts and tends to bolster his claim that Ecuador is the children's true home. Inexplicably, the same paragraph refers to his participation in a related Scottish litigation, perhaps a stray reference from a prior complaint used as a form.

[7]     All of the questions in the questionnaire are rendered in both Spanish and English. Some of the answers are likewise stated in Spanish and then in English translation. Most answers, however, including those quoted in text above, appear only in English translation.

children." (ECF no. 1-6 at 2, Question no. 17) Another mistranslation, perhaps, but the mistranslations are beginning to pile up.

Even harder to brush off as a mistranslation is the attached "Brief Resume of the Facts," consisting of an original in Spanish, signed by Albornoz, and an English translation. (ECF no. 1-6 at 5–6) There, Albornoz states:

> On June 18, 2015, a few days before airline tickets expired, unexpectedly and without my consent or authorization, my wife Kristhel travel to the United States with my children [*redacted*] (9) and [*redacted*] (7 years); even withdrawing children from school before the end of the school year. From some relatives I received the information that my family was living in New Jersey.

(ECF no. 1-6 at 5) The reader fluent in Spanish may compare the original, copied out in the margin.[8]

This revisionist account, written after the marriage had soured for good, spins the departure from Ecuador as a child abduction, accomplished "unexpectedly" and without Albornoz's prior knowledge. Albornoz implies that but for the intervention of kindly relatives, he would not have learned that the children had been taken to New Jersey. This version cannot be reconciled with even his own testimony. The most charitable interpretation of this is that it was an opportunistic slant on the facts.

The evidence that Albornoz agreed to and cooperated in the June 2015 departure from Ecuador is overwhelming, and his contrary statements raise general credibility concerns. Nevertheless, I consider his current claim, which is slightly different: *i.e.,* that his consent was genuine, but was founded on Diaz's agreement to return to Ecuador with the children after a month or two. The evidence adduced thus far weighs to the contrary. And there is much

---

[8]   "El 18 de junio 2015, pocos dias antes de que caducaran los boletos aéreos, sorpresivamente y sin mi consentimiento ni autorización, mi esposa Kristhel viajo a Estados Unidos con mis hijos [*redacted*] (9 años) y [*redacted*] (7 años): incluso retirando a los niños del colegio antes de que termine el año escolar. Por información de familiars supe que estaban viviendo en New Jersey." (ECF no. 1-6 at 6)

additional evidence of the couple's agreement to move back to the U.S. permanently.

### 4. June-November 2015

Supporting Diaz's version—*i.e.,* that the parties did not intend a vacation, but a permanent return to the U.S.—is the evidence of what happened during her stay here.

Ms. Sinning testified that in June 2015 she received a telephone call from Albornoz, asking her to pick up Diaz and the children from the airport in New York. Her account of the conversation in her declaration does not indicate either way whether Albornoz said the stay would be permanent. (CSD ¶5) At trial, Sinning testified that in the same call, she asked Albornoz if he was returning; he answered that he wasn't coming yet, as he had not yet sold the business in Ecuador. On June 18, 2015, Sinning did pick up Diaz and the children from the airport, telephoning Albornoz from the car and afterward to confirm. (CSD ¶¶ 5–7)

Ms. Suarez testified that Albornoz telephoned her in June 2015 as well, and asked her to let Diaz and the children stay in her apartment. She says that this was never characterized as a vacation, or as a temporary arrangement pending their return to Ecuador. Suarez was quite clear that Albornoz said he wanted her to host the family until he, Albornoz, arrived in the U.S. He said that he hadn't been able to sell his things yet, but that when he did, he would come.

As it happened, Diaz and the children stayed with Suarez from June until late November or early December 2015. They grew personally close, and the children became friendly with Suarez's grandchild. They lived in close quarters. Suarez was present for speakerphone conversations with Diaz and the children in which Albornoz said that he had to sell his printing machinery, which was expensive and could not be left behind. He said on the telephone that as soon as the equipment was sold, he would return to the U.S.

During the summer, Diaz and her children spent a fair amount of time with Yamile Pardo. Pardo testified that she gave Diaz a part-time job in her clothing store. Diaz and the children would regularly socialize in Pardo's office and a nearby playroom. Pardo was present for Facetime conversations in which Albornoz told T.A.A. that he would be returning to the U.S. soon, after he sold machinery. From her extensive conversations with Diaz, Pardo believed that Diaz had returned to the U.S. permanently, and never heard anything about going back to Ecuador.

Diaz sought to enroll the children in public school for the 2015–16 school year. To do so, she needed their Ecuadorian school records.[9] Albornoz acknowledges that he assisted in obtaining the records. He portrays this, fairly I think, as a choice between assisting with the records or denying the children their schooling; as he sees it, he had little choice but to go along with what was a *fait accompli*. It does demonstrate, however, that Albonoz knew the children's schooling had been set up for the coming year. The significance would be that Albornoz did not immediately or overtly react to what he now portrays as a massive betrayal.

Diaz did enroll the children in the 1st and 3rd grades at an elementary school in West New York. At about the same time, in September 2015, Diaz found another part time job at the Pain Relief Clinic in North Bergen. Albornoz said that Diaz limited his telephone contact with the children, but Diaz and other witnesses denied this. At any rate, the parties seem to agree that through the fall, phone contact grew more sporadic. Albornoz testified that he was growing more concerned that they were not returning. He admitted, however, that he did not then ask them to return. He did not attempt to buy tickets or make travel arrangements for such a return. And according to Suarez, he did not ask for her assistance in returning the family to Ecuador.

---

[9]     Apparently that is a more cumbersome process there than here, requiring that certain documents be presented and an official apostille affixed to the records.

### 5. Albornoz's December 2015 visit

At some time in late November or early December 2015, Maria Suarez told Albornoz on the telephone that she needed the apartment, and encouraged him to resume responsibility for his family. Albornoz responded again that he had not yet come because he had not sold his equipment. (MSD ¶7)

In December 2015, Albornoz came to the United States for about a month. Albornoz stayed with his sister, and attended the children's Christmas concert. (MSD ¶9)

Albornoz's visit coincided with Diaz and the children's moving out of Suarez's apartment and into one of their own, for which Diaz signed a one year lease. Diaz testified that Albornoz helped them move and make lease arrangements. (KDD ¶ 24) Albornoz denied helping them move, but he acknowledged that he bought them furniture for the new apartment. This was corroborated by Sinning, who testified that she ran into Albornoz on the street in December 2015. Albornoz told Sinning that he was not back in the U.S. for good, because he hadn't sold his business yet, and said he was buying furniture for the new apartment. (CSD ¶ 8) As in the case of the school records, Albornoz portrayed this, not as an indicator of consent, but as a necessity for the good of the children.

By this time, Diaz had come to the conclusion that she wanted to end the marriage. She told Suarez this, and also told Albornoz. According to Diaz, Albornoz said he would return to the U.S. immediately and permanently if it meant getting back together; Diaz refused, but said he should return anyway to be close to the children. (KDD ¶ 25)

Suarez described Albornoz's state as "emotional." During his December visit, he asked Suarez to intercede with Diaz. (MSD ¶9) At no time, however, did he tell Suarez that he was seeking to have her return to Ecuador with the children; his focus, she said, was on reconciliation. (MSD ¶ 11)

Albornoz returned to Ecuador in January 2016.

### 6. Aftermath

On February 23, 2016, Diaz executed a complaint for divorce, which was file-stamped by the New Jersey state court on March 21, 2016. (ECF no. 1-8)[10] According to Albornoz, in March 2016 she sent a letter to their pastor in Ecuador, stating that she would be seeking a divorce. On March 22, 2016, Albornoz filled out the Request for Return of Children, which the Ecuadorian authorities forwarded to the U.S. Department of State on March 30, 2016. (ECF no. 1-1) On October 31, 2016, the U.S. State Department notified the New Jersey state judge presiding over the divorce case that an application under the Hague Convention was pending. (ECF no. 1-8 at 11)

At the evidentiary hearing on April 7, 2017, Ms. Diaz acknowledged that she has now moved on to another relationship, and is in fact pregnant. Although neither the relationship nor the pregnancy is directly relevant, I granted the request of Albornoz's counsel to admit this evidence for the purpose of showing potential bias.

### 7. The children's acclimatization

The parties introduced only limited evidence as to whether the children became so acclimatized to life in Ecuador that it displaced the U.S. as their habitual residence. And, as noted above, the issues as presented by the parties do not focus so much on habitual residence as they do on the wrongfulness, or not, of the removal. I nevertheless briefly summarize the evidence of acclimatization here.

T.A.A. and J.G.A., born in 2006 and 2008 in New Jersey, were 7 and 9 at the time of the 2015 removal and are 8 and 10 today. They are both U.S. citizens. They lived with both parents in the U.S. from their birth until July 2014, when they traveled to Ecuador. They lived with both parents in Ecuador from July 2014 until June 2015. And they lived with Diaz in New Jersey from

---

[10] *Diaz v. Albornoz,* No. M-09-187176 (N.J. Superior Court, Chancery Division, Hudson County).

June 2015 to the present. Thus their lives, with the exception of the 11-month period from July 2014–June 2015, were lived in the U.S.

There seems to be no dispute that during their initial residence in the United States, the children were happy and well-adjusted. T.A.A. took dance classes up to five times per week and participated in competitions.

In Ecuador, according to Diaz, living arrangements were somewhat makeshift. (KDD ¶ 13) I do not, from this, jump to the conclusion that the quarters were temporary, however. Diaz was a bit grudging in saying she "assumed" the children had friends at school. She noted that T.A.A. had some difficulty fitting in; in particular she was left home from a farm outing because she did not have the right shoes, and was excluded from English-language activities because she already spoke English well.

Everyone seems to agree that the children speak English perfectly, and that they also speak Spanish, though perhaps less well. This, according to Diaz, caused T.A.A. in particular to struggle somewhat in the Ecuadorian school. The school records seem to indicate, however, and the parties do not deny, that she fulfilled requirements and completed the school year successfully. (KDD ¶ 14; ECF no. 1-9) Albornoz testified that the children did well in Ecuador; enjoyed being surrounded by so many cousins; and joined in with church and school activities.

Strictly speaking, the children's re-acclimatization to the U.S. after June 2015 might not be relevant if the removal from Ecuador was wrongful. Nevertheless, to complete the picture, I summarize evidence of the children's activities upon their return to the U.S. in 2015. It seems that the children have flourished, without any overt difficulties in adjustment. They socialized with the children of Pardo and the grandchild of Suarez, going to the beach, playing, and having sleepovers. T.A.A. takes swimming lessons, and both children have made many friends and are happy. T.A.A. is an honor student and is in chorus.

## IV.    CONCLUSION

I accept as true the evidence that Albornoz and Diaz agreed in 2014 that the sojourn in Ecuador was to be temporary. Contrariwise, I do not find strong evidence of shared parental intentions to move to Ecuador permanently.

I accept the evidence that Diaz's June 2015 return to the United States with the children was not wrongful, but agreed-to. The picture that emerges is that Diaz had grown increasingly dissatisfied, and at any rate did not want to live in Ecuador. Albornoz wanted to keep the marriage together, and agreed to return to the U.S. in the hope of salvaging it. It appears that he cooperated fully with the children's removal from Ecuador, resettlement in the U.S., enrollment in a New Jersey school for the 2015–16 school year, and relocation to their own apartment. It was only later, when the marriage proved unsalvageable, that he began to maintain that moving back to the U.S. had never been his intent. Indeed, it seems that he brought the petition for return of children either concurrently with, or as a response to, Diaz's filing for divorce.

For the reasons stated above, the Petition for Return of Children under the Hague Convention and ICARA is **DENIED**. An appropriate order follows.

Dated: April 18, 2017

**KEVIN MCNULTY, U.S.D.J.**